**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| METTISA MCLEOD and DANIEL MCLEOD, as Next friend on behalf of their minor son, M.M., and in their Individual capacities, | ) ) ) ) | |
| | ) | **Jury Demanded** |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| TRIAD COMMUNITY UNIT SCHOOL DISTRICT #2, BOARD OF EDUCATION | ) ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiffs Mettisa McLeod ("Mettisa") and Daniel McLeod ("Dan") (collectively "Parents"), individually and on behalf of their minor child, M.M. ("M.M." or Student") (collectively "Plaintiffs"), through their attorneys, pursuant to Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794 *et seq.*, the Americans With Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, and the Illinois Human Rights Act ("IHRA"), 775 ILCS 5/1-101 *et seq.* for their complaint regarding disability discrimination, retaliation, and related violations against Defendant Triad Community Unit School District #2 Board of Education ("District 2"), and as well as for an award of monetary damages, attorney's fees, costs, and all other available relief, states as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this controversy pursuant to 28 U.S.C. §§ 1331 and 1343, and 42 U.S.C. § 12117(a).

2. This Court has supplemental jurisdiction over this controversy with respect to the IHRA claims pursuant to 28 U.S.C. § 1367.

1

3.    Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202.

4.    Venue is properly located in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to this complaint occurred here.

## PARTIES

5.    Plaintiff M.M. is a fifteen-year-old boy who resides in Troy, Illinois, with his parents.

6.    Plaintiff has multiple disabilities, including Cerebral Palsy, Hydrocephalus, and a seizure disorder.

7.    M.M. is an individual with a disability as defined by the ADA, 42 U.S.C. § 12102(1); Section 504, 29 U.S.C. § 705(20)(B); and IHRA, 775 ILCS 5/1-103(I).

8.    M.M. is a student as defined by IHRA, 775 ILCS 5/5A-101(C).

9.    District 2 is the governmental unit responsible for administering public education programs, accommodations, and schools within its jurisdiction.

10.    District 2 is a public entity and therefore a covered entity under Title II of the ADA, 42 U.S.C. § 12131(1), and its implementing regulations, 28 C.F.R. § 35.104.

11.    District 2 receives federal financial assistance and is therefore a covered entity subject to the requirements of Section 504, 29 U.S.C. § 794, and its implementing regulations, 34 C.F.R. Part 104.

12.    District 2 is a place of public accommodation as defined by IHRA, 775 ILCS 5/5-101(A)(11).

13.    District 2 is an institution of elementary, secondary, or higher education as defined by IHRA, 775 ILCS 5/5A-101(A).

14.    Section 504, 29 U.S.C. § 794, and Title II ADA, 42 U.S.C. § 12131 *et seq.*, prohibit

2

public school districts from discriminating against students with disabilities and require schools to provide equal access, reasonable modifications, and nondiscriminatory educational services.

15.   The President of the Board of Education of District 2 is Jeff Hewitt, the Superintendent of District 2 is Dr. Jason Henderson, and its principal place of business is 203 E. Throp St., Troy, IL 62294.

## FACTUAL BACKGROUND

### M.M.'s Disabilities, Eligibility, and Need for Accommodations

16.   In January 2014, Plaintiff M.M. began attending District 2.

17.   In November 2013, District 2 found that M.M. was eligible for special education services.

18.   M.M. has been diagnosed with multiple disabilities, including Cerebral Palsy, Hydrocephalus, and a seizure disorder.

19.   M.M.'s diagnoses are mental impairments that substantially limit major life activities, including thinking, learning, and communicating.

20.   Because of his disabilities, District 2 began providing accommodations to M.M. in or about November 2013, including, but not limited to, specialized transportation, occupational therapy, physical therapy, speech and language therapy, behavior support, paraprofessional support, assistive technology, frequent breaks, advance notice of changes in routine, adjustments to his work environment to meet sensory and physical needs, tests read aloud, and the provision of a scribe.

21.   Without these accommodations, Plaintiff is unable to meaningfully access instruction, participate in classroom activities, regulate his behavior, or safely function within an academic environment.

*Triad Middle School, Reduction of Supports, and Pressure for Outplacement*

22.    In August 2022, M.M. began attending Triad Middle School ("TMS") in the District.

23.    In September 2022, TMS assigned multiple substitute teachers to M.M.'s classroom due to a late resignation by his assigned teacher. The District hired JoAnn Mitzel as M.M.'s classroom teacher shortly thereafter. Mitzel had previously retired and had limited recent experience teaching in M.M.'s educational setting.

24.    On or about October 4, 2022, Parents firmly requested independent physical and occupational therapy evaluations, citing persistent difficulty with goal development and the District's ongoing refusal to provide required accommodations. The District unequivocally denied that request, an action Parents assert amounts to discriminatory denial of reasonable accommodations essential for M.M.'s disabilities.

25.    On or about October 5, 2022, Parents requested that the District adjust physical therapy goals. Parents expressed concern that the District would try to conduct PT via a paraprofessional or peer mentor instead of a licensed therapist.

26.    Parents also opposed reductions in occupational and speech therapy minutes.

27.    In October 2022, Parents attended a meeting with Defendant staff. During that meeting, District Director of Student Programs and Services Renee Voegele, who had not previously met the family, conveyed that M.M.'s continued access to his accommodations depended largely on improved behavioral compliance. She further implied that responsibility for achieving such compliance rested primarily with M.M. and Parents. Parents reasonably understood the District's position as a "shape up or ship out" approach to M.M.'s disability-related behaviors rather than a commitment to providing the consistent supports and regulation assistance he

required to access his education.

28.   Shortly after the meeting, Linda Kowalski, District Director of Special Education, took over communications with the family.

29.   On or about October 16, 2022, Parents requested that District staff provide weekly written reports specifying all interventions attempted to de-escalate M.M.'s behaviors before labeling any incident as 'aggression.' The District failed to meet this requirement consistently.

30.   On or about November 10, 2022, Parents wrote to Kowalski, explaining that their lack of trust stemmed from the team's failure to show consistency and good-faith efforts to meet M.M.'s needs, rather than from M.M.'s challenging transition itself.

31.   In December 2022, the District held another meeting in which they involved Dr. Mark Dixon.

32.   District staff suggested that Parents withhold interventions to correct M.M.'s behavior and proposed home visits and video surveillance.

33.   Parents objected to the District's proposal, stating that this was retaliatory and meant to justify a more restrictive placement.

34.   Parents also asked the District to add their concerns, including that staff labeled M.M. as "violent" and "disruptive" to build a case for outplacement.

35.   On or about December 22, 2022, Parents objected to the District's proposed out-of-district placement and requested details regarding any proposed facility.

36.   When the District sent M.M.'s records to potential placements, none accepted M.M., citing his seizure disorder and behavioral needs.

37.   In Spring 2023, M.M. continued to struggle. Parents withheld M.M. from the District's Extended School Year ("ESY") that summer due to school refusal and concerns for his

mental health.

38.     In August 2023, M.M. started his seventh-grade year at TMS. M.M.'s new teacher, Hannah Gibson, contacted Parents before the school year to discuss concerns.

39.     Parents expressed their trauma from the prior year and objected to the prior District's fixation on M.M.'s behavior and their push for outplacement.

40.     Due to the ongoing emotional toll from the previous year, which they attribute to District conduct they allege was discriminatory, Parents requested written notice of any proposed service and accommodation changes before meetings and insisted that only staff with daily contact with M.M. attend future meetings.

41.     This persistence highlights how the events of the past year left the family cautious and less engaged, impacting their decisions and interactions throughout the 2023–2024 school year.

42.     Although the 2023-2024 school year was largely uneventful, the family's limited engagement with the District was a direct result of their ongoing emotional distress.

### *Renewed Requests for Supports, Isolation, and Denial of Services in 2024-2025*

43.     On or about September 26, 2024, Mother asked M.M.'s classroom teacher, Anna Monson, if the amount of M.M.'s services and accommodations were changing. Monson assured Mother that M.M.'s minutes were not changing.

44.     On or about February 4, 2025, Kowalski called Parents and left a voicemail stating that M.M.'s novice classroom teacher, Anna Monson, was struggling to meet M.M.'s needs. Parents interpreted this as a pretext for renewed efforts to outplace them.

45.     Later that day, the Parents e-mailed Kowalski and requested that all communications occur in writing to prevent misrepresentations.

46.     On or about February 5, 2025, Kowalski requested a one-on-one meeting with

Parents, which Parents refused, reiterating their requirement for written correspondence only.

47.     On or about February 6, 2025, Kowalski e-mailed Parents to request consent for an updated behavioral assessment and behavior support plan for M.M.

48.     That same day, Parents promptly responded to Kowalski, granting consent for the behavioral assessment but explicitly insisting that an independent behavioral professional, not the District's contracted Board-Certified Behavior Analyst, Dr. Dixon, conduct M.M.'s assessment.

49.     On or about February 7, 2025, Kowalski acknowledged the Parents' e-mail and asked them to provide dates for a meeting. She also confirmed that the District was looking for an alternate BCBA provider.

50.     On or about February 14, 2025, Parents e-mailed Kowalski and suggested March 7, 2025, as a meeting date. In the same correspondence, Parents formally notified Kowalski that they had retained educational advocates, Tiffany Blake and Therese Hilker of ConnectEd Advocates, to attend any meetings going forward.

51.     On February 18, 2025, Kowalski declined the Parents' proposed March 7 date, giving no explanation. Later that day, Kowalski e-mailed consent documents, requesting signatures even though the Parents had already granted written consent on February 6.

52.     On or about February 20, 2025, Parents signed and returned the District's consent forms.

53.     On or about February 26, 2025, and March 5, 2025, Parents e-mailed Kowalski requesting a timeline update for the meeting.

54.     On March 6, 2025, Kowalski replied, stating she was 'unable to schedule' the meeting as the District had still failed to secure a BCBA professional.

55.     On or about March 13, 2025, Parents sent Kowalski another e-mail proposing five

alternative dates when they and their advocate could attend.

56.    On or about March 17, 2025, Parents e-mailed Kowalski and the District BCBA, explicitly outlining their concern that the District was neglecting to meet M.M.'s comprehensive needs.

57.    On or about March 18, 2025, Parents met with BCBA Dr. Brandon May and Kowalski. During that meeting, Kowalski claimed that District staff were "not comfortable" implementing a non-violent restraint-in-crisis plan, despite District staff having received prior training.

58.    On March 19, 2025, District staff called Parents to the school to help "reset" M.M., who was highly distressed. Upon arrival, Father observed multiple District staff surrounding M.M. and continuing to speak to him despite his escalating agitation. Father asked District staff to step back and stop talking to M.M., as their behavior seemed to be provoking M.M.'s agitation, rather than helping.

59.    Father ultimately removed M.M. from school to de-escalate the situation. Despite this, the District later misrepresented the incident and issued M.M. a half-day suspension.

60.    On or about March 24, 2025, the District sent Parents a Behavior Incident Report ("BIR"). In that BIR, the District stated that M.M. began exhibiting aggressive behaviors toward District staff.

61.    On March 25, 2025, Kowalski sent Parents a letter notifying them of the District's decision to institute a three-day suspension based on M.M.'s "gross disobedience or misconduct." Kowalski also left Parents a voicemail stating, "The team has decided on a suspension. We request a meeting scheduled as soon as possible, and we request you waive the ten (10) day meeting notice."

62.    On or about March 26, 2025, Parents requested that the District provide an updated

suspension timeline on the District's online record platform, Skyward. Later that day, District Principal Brooke Weimers updated Skyward to reflect M.M.'s three-day suspension. Weimers also added a half-day suspension to M.M.'s record for March 19, 2025, reflecting the day on which Father removed M.M. from school after District staff escalated M.M.'s behaviors.

63.    On or about March 31, 2025, Parents attended a meeting with the District. The BCBA did not provide documents beforehand and did not attend.

64.    During that meeting, Kowalski stated, "My staff needed a break from [M.M.]," when asked by Parents to explain M.M.'s suspensions. Kowalski repeatedly pressured Parents to verbally agree to a plan, which the District read aloud during the meeting. Meeting notes later prepared by the District did not reflect Kowalski's statements or Parents' objections.

65.    On or about April 3, 2025, District teacher Anna Monson noted in M.M.'s daily communicator that M.M. "spent most of the day in his calm down room."

66.    On or about April 7, 2025, Parents discovered that the District was isolating M.M. in a "calm-down room" for over 90 minutes daily during instructional hours, purportedly as a "break between lunch and P.E." Parents requested documentation of the exact time M.M. spent in the "calm-down room" and activities completed, as well as a follow-up meeting.

67.    On or about April 30, 2025, Parents sent the District a request for therapy logs, suspecting that the District was providing minimal services and accommodations to M.M.

68.    On or about May 1, 2025, Parents attended a meeting with District staff. During that meeting, District staff admitted to significant failures in accommodating M.M. and promised Parents compensatory services. Kowalski told Parents that speech therapy records from the 2022–2023 school year were "unavailable" and that she had "no pathway" to obtain them.

69.    On or about May 6, 2025, Parents submitted a formal request to the District to

provide therapy logs from the 2022-2023 and 2024-2025 school years.

70.     On or about May 7, 2025, Kowalski sent Parents M.M.'s therapy logs. Upon reviewing those therapy logs, Parents discovered systemic non-delivery of M.M.'s accommodations across all disciplines extending back to the 2022-2023 school year. Parents discovered that the District only provided all of M.M.'s accommodations for one or two months per year over the last several years.

71.     On or about May 7, 2025, Parents filed a complaint with the U.S. Department of Education's Office for Civil Rights.

72.     On or about May 12, 2025, the District held a Domains meeting with Parents. During that meeting, Kowalski denied compensatory speech services for the 2022–2023 period. District PT staff claimed to have already provided all compensatory minutes owed to M.M.

73.     The District also denied Parents' requests for independent cognitive, speech, and OT evaluations and refused to provide compensatory time for holidays or missed service days.

74.     Following that meeting, the Parents requested Medicaid billing logs for school health services provided by the District to M.M.

75.     On or about May 12, 2025, Parents filed a complaint with the Illinois State Board of Education ("ISBE").

76.     On or about May 15, 2025, Parents filed an Illinois Educator Misconduct Report against Kowalski for ethical violations, including falsification of records, disability-based discrimination, and retaliation against parental advocacy.

77.     On or about May 21, 2025, Parents met with the District to discuss potential compensatory minutes owed to M.M.

78.     During that meeting, Parents requested written notice of the number of service

minutes the District claims M.M. missed, along with a written delivery plan. Parents also attempted to discuss their disagreement and concern with M.M.'s ninety (90) minute isolation in the "calm down" room.

79.    After the Parents provided these questions, concerns, and suggestions, Kowalski abruptly stated, "We are done!" and refused to continue the discussion of compensatory minutes, directing Parents to "argue with the district lawyer."

### *Formal Complaints, State Findings, and Continued Deficiencies*

80.    On or about May 28, 2025, Plaintiffs submitted a formal Uniform Grievance Procedure Complaint against District 2 to Defendant Superintendent Dr. Jason Henderson, consistent with District policy. The grievance asserted multiple allegations that District 2 had failed to provide M.M. with the accommodations, supports, and educational services to which he was entitled and had further subjected M.M. to discriminatory and retaliatory treatment because of his disabilities.

81.    In Summer 2025, M.M. attended ESY. District staff claimed to have provided makeup therapy minutes to M.M.

82.    Parents expressed concern that the District falsified documentation regarding M.M.'s accommodations and services, as the District claimed that M.M.'s supports had been withheld due to his "behavior."

83.    On or about July 29, 2025, the ISBE completed its investigation into Parents' May 13, 2025, complaint against the District. A copy of which is attached hereto as Exhibit A.

84.    In that investigation, the ISBE found that the District must:

    a.    Inform all related services staff of the requirement to provide SE and related services in accordance with IEPs, per the state SE rule at 23 IAC, 226.200;

11

b.   Offer 90 minutes of compensatory OT services and 65 minutes of compensatory PT services to the student for services not received during the 2024-25 school year. The parent can choose to decline these services or agree to a lesser amount if deemed appropriate. The district and parent should mutually determine the schedule and setting for delivering the compensatory services that the student will receive; and

c.   Provide S/L, OT, and PT services to the student in accordance with his IEP.

85.   The ISBE investigation report findings were the first time Parents were alerted that the District changed M.M.'s OT and ST service minutes, despite Monson's previous assurances that these minutes would not be changed.

86.   On or about August 13, 2025, M.M. began his first day of ninth (9th) grade at Triad High School ("THS").

87.   Since the start of the 2025–2026 school year, District 2 issued numerous behavioral incident reports concerning M.M., including approximately seventeen (17) during the first semester alone. District 2 continued issuing additional reports during the second semester.

88.   Each of these reports describes disability-related behaviors consistent with M.M.'s known diagnoses and documented needs for structure, sensory regulation, and emotional support.

89.   On or about September 3, 2025, Henderson sent Plaintiffs a Uniform Grievance Procedure closure letter stating, in substance, that the District had not found "sufficient evidence to support [Plaintiffs'] allegations" and would take no corrective action in response to Plaintiffs' complaint.

90.   On or about September 15, 2025, Mother requested M.M.'s school records from

12

the District. THS Assistant Principal Laure Ryterski provided Mother with a records release. Mother signed and submitted the school records release that same day.

91.     On or about October 2, 2025, Parents attended a meeting with District staff. During that meeting, Parents expressed concern about the amount of time M.M. spends in the calm-down/recovery room rather than receiving instruction and requested an updated BIP to limit M.M.'s time outside of the classroom. Parents also requested compensatory service minutes with therapy logs.

92.     On or about November 10, 2025, Parents attended a meeting with Kowalski, District staff, related service providers, the school psychologist, and District counsel Michelle Todd to review M.M.'s progress, behavior data, and recent isolated time-outs.

93.     During that meeting, Parents questioned why multiple goals were marked as *"sufficient progress – anticipate will meet goal"* even though M.M. had not met those goals, and they no longer appeared on progress reports. The District admitted its software automatically generated certain progress labels and acknowledged the need to correct the system to ensure accuracy.

94.     Parents also raised concerns about behavioral data collection and a lack of transparency regarding access to Google Drive reports, the loss of instructional time due to repeated isolation in the calm-down room, and inconsistencies in service documentation. The District agreed that communication had been unclear and committed to improving real-time data sharing, clarifying when isolation occurs, and documenting instructional time more accurately.

95.     Parents also asked for clarity on service changes, including the discontinuation of M.M.'s iPad as a behavioral support, modifications to speech and OT minutes, and the rationale for placement decisions. The District explained that iPad use had been phased out as it became

"ineffective," OT and speech minutes were adjusted based on prior goal completion, and placement would remain unchanged pending additional assessment.

96. Parents emphasized that IEPs and Prior Written Notices ("PWNs") must fully document all discussions, rationales, and rejected options. The District and its counsel agreed, noting that future IEPs would include detailed meeting notes, clearer goal tracking, and written explanations for any changes in services, data collection, or placement.

97. On or about December 3, 2025, Mother e-mailed Ryterski and requested an update as to whether her September 15, 2025, records request was completed. Ryterski responded to Mother and stated that she believed "therapy logs" had been sent to M.M.'s counsel.

98. On or about December 5, 2025, Mother followed up with Ryterski regarding the document request. Specifically, Mother requested that the District provide confirmation of what documents were sent, and the date and method upon which the documents were sent.

99. The District never meaningfully responded to Mother's record request or questions.

***IDHR Charges and Immediate Retaliation***

100. On December 17, 2025, Plaintiffs filed a charge of discrimination with the IDHR alleging that the District discriminated against M.M. on the basis of his disabilities, failed to provide reasonable accommodations, and retaliated against him for engaging in protected activity. Plaintiffs further alleged that the District discriminated against Parents based on their association with an individual with disabilities and retaliated against them for advocating on behalf of M.M. and asserting his rights under federal and state law. IDHR Charge Nos. 2026SP0754, 2026SP0756, and 2026SP0757.

101. The District was immediately aware of Parents' filing of the charges of discrimination.

102.    On January 6, 2026, Plaintiff M.M. returned to school after winter break.

103.    Immediately after Plaintiff M.M.'s return, District 2 began issuing daily BIRs. These reports reflected conduct consistent with M.M.'s disabilities and suggested that District 2 staff provoked M.M. and/or withheld the supports and accommodations he needed to regulate his behavior.

104.    On January 12, 2026, District 2 suspended M.M. for two days for allegedly violating the student behavior policy. District 2 claimed that M.M. began exhibiting behavior issues when he exited the bus that morning and that, by 9:41 a.m., he had remained at a "Level 4" for approximately two hours.

105.    Later, District bus driver, Cheryl [Last Name Unknown], and bus aide, Chloe [Last Name Unknown], told Plaintiffs that M.M. had no issues exiting the bus or during transportation.

106.    After that incident, Kowalski instructed Ryterski and THS Principal Kelli Barbour to inform Plaintiffs, in a punitive manner, that "[M.M.]'s out for two days!!"

107.    On January 14, 2026, Plaintiffs met with District 2 staff to discuss M.M.'s need for reasonable accommodations and the impact of his multiple disabilities.

108.    During that meeting, District 2's physical therapist recommended discontinuing physical therapy and stated, in substance, that because of M.M.'s diagnosis of cerebral palsy, he had no meaningful potential to acquire new skills and had not made such gains for years.

109.    That opinion directly contradicted recommendations from M.M.'s treating physicians.

110.    Within approximately one hour after the meeting ended, District 2 issued another Level 4 BIR to M.M.

111.    On January 21, 2026, Plaintiffs attended another meeting with District 2 staff.

112.   During that meeting, Defendant special education teacher Cayla Seaton told Plaintiffs that District 2 viewed M.M.'s behaviors as "premeditated." District 2's contracted behavior analyst, Dr. Mark Dixon, told Plaintiffs that he believed M.M.'s behaviors were "attention seeking."

113.   Plaintiffs asked whether District 2 would expect similar conduct from general education students if M.M.'s behaviors were truly unrelated to disability, and if so, at what frequency. Rather than answer the question, Dr. Dixon stated that several students in M.M.'s classroom were "way more disabled than him" and "don't act like that."

114.   During that same meeting, the physical therapist repeated her January 14 recommendation to discontinue physical therapy. District 2 also reinforced its position that it would suspend M.M. for conduct that constituted manifestations of his disabilities rather than provide disability-related supports or apply neutral disciplinary practices. Seaton further stated that the events leading to the January 12 suspension had been "exhausting for everyone," which suggested that District 2 disciplined M.M. because staff did not want to accommodate his disability-related needs.

115.   District 2 also discussed a change of placement during the January 21 meeting. Plaintiffs stated that they did not believe M.M. required a private placement because of his disabilities. However, Plaintiffs acknowledged that District 2 had failed to provide M.M. a safe environment or educate him in the least restrictive environment, and they therefore agreed to a change in placement because District 2 had not properly supported him in his current setting.

116.   On January 25, 2026, District 2 held classes virtually as an E-Learning Day. M.M. completed his assignments and followed his teacher's instructions to verify completion of the work. Despite that compliance, District 2 marked M.M. absent without excuse.

117.    On January 28, 2026, Plaintiffs received notices from the IDHR opting out of the investigative and administrative process, administratively closing the initial charges, and authorizing Plaintiffs to file suit on those charges.

118.    On January 29, 2026, District 2 issued two (2) additional BIRs stating that M.M. may have ingested two staples and that he was not experiencing shortness of breath. Despite the possibility that M.M. ingested non-food objects, District 2 failed to follow its own procedures governing ingestion incidents.

119.    Later that same day, THS's nurse called Plaintiff Mettisa at work. Although the nurse stated that she was calling about the possible staple ingestion and related BIR, she focused much of the conversation on Ms. McLeod's medical degree rather than on M.M.'s condition or care.

120.    On February 18, 2026, Plaintiffs filed additional charges of discrimination with the IDHR based on District 2's continued and escalating retaliatory conduct after Plaintiffs filed the initial charges. In those charges, Plaintiffs alleged that District 2 continued to deny reasonable accommodations, retaliated against M.M. for engaging in protected activity, discriminated against Plaintiffs based on their association with an individual with disabilities, and retaliated against Plaintiffs for continuing to advocate for M.M.'s rights under federal and state law. Those charges were assigned IDHR Charge Nos. 2026SP1040, 2026SP1041, and 2026SP1042.

121.    On or about February 23, 2026, District 2 notified Plaintiffs of another ingestion incident involving non-food items and advised Plaintiffs to contact M.M.'s pediatrician for recommendations. This incident heightened Parents' concern that District 2 could not or would not safely supervise M.M. or implement appropriate supports for his known disabilities.

122.    On February 26, 2026, Plaintiffs attended an intake meeting with the Hope School

regarding M.M.'s transfer. During that meeting, Plaintiffs requested that M.M. begin attendance as soon as possible because of their increasing concern for his physical safety, psychological well-being, and overall family welfare while he remained at District 2.

### *Transfer to Hope School and Improvement Outside District 2*

123. On March 4, 2026, M.M. attended his first day at his new placement, the Hope School. Since beginning at Hope School, M.M. has stopped referring to himself as a "bad boy," a phrase he used while attending District 2. Parents have never used that phrase to describe M.M.

124. On March 13, 2026, Plaintiffs received additional notices from the IDHR opting out of the investigative and administrative process, administratively closing the subsequent charges, and authorizing Plaintiffs to file suit on those charges.

125. District 2 engaged in the discriminatory and unlawful practices described herein intentionally and with deliberate indifference to Plaintiffs' rights.

126. As a direct and proximate result of District 2's conduct, M.M. suffered damages, injuries, pain and suffering, inconvenience, emotional distress, educational harm, and a diminished quality of life.

### COUNT ONE: VIOLATION OF THE IHRA FOR DISABILITY DISCRIMINATION BY DISTRICT 2 AGAINST M.M.

127. Plaintiffs reallege and incorporate herein by reference the foregoing paragraphs of this Complaint.

128. It is the public policy of the State of Illinois to prevent disability discrimination in elementary, secondary, and higher education.

129. At all relevant times, Plaintiff M.M. was a qualified individual with a disability within the meaning of the IHRA, including 775 ILCS 5/1-103(I). M.M. has multiple physical and mental impairments, including Cerebral Palsy, Hydrocephalus, and a seizure disorder, that

18

substantially limit one or more major life activities, including learning, communicating, mobility, self-regulation, and safe participation in school activities.

130. M.M. can access his education with reasonable accommodation.

131. The accommodation requested by Parents did not impose an undue financial or administrative burden or fundamentally alter the nature of District 2's programs.

132. District 2 is an Institution of Elementary, Secondary, or Higher Education as defined by 775 ILCS 5/5A-102(A).

133. Plaintiff is a student as defined by 775 ILCS 5/5A-102(C).

134. District 2 is a place of public accommodation as defined by 775 ILCS 5/5-101(A)(11).

135. In relevant part, 775 ILCS 5/1-102(A) states it is the public policy of this state "[t]o secure for all individuals within Illinois the freedom from discrimination against any individual because of his or her…disability….and the availability of public accommodations."

136. District 2 wrongfully refused to make reasonable accommodations to its educational programs, services, activities, and benefits to allow M.M. to fully and safely participate in his education programs.

137. District 2 discriminated against M.M. on the basis of disability by failing to provide reasonable accommodations and equal access to its educational programs and services. District 2's discriminatory conduct included, but was not limited to, failing to provide communication and speech-related supports necessary for M.M. to access instruction, repeatedly removing M.M. from the classroom and isolating him in the calm-down room instead of providing supportive interventions, disciplining M.M. for disability-related conduct without first providing reasonable accommodations, failing to provide effective behavioral and sensory-regulation supports, and

otherwise denying M.M. a meaningful opportunity to participate in classroom instruction, school activities, and the benefits of a public education on an equal basis with his peers.

138.    At all relevant times herein, District 2 had actual knowledge of M.M.'s meaningful exclusion from school and the substantial risk of harm that this created for M.M.

139.    District 2 intentionally excluded M.M. from meaningful participation in its instructional programs due to his disabilities. District 2 was deliberately indifferent to M.M.'s unqualified right to meaningful participation in its education programs.

140.    By refusing to provide reasonable accommodation to its education programs to allow M.M. to participate meaningfully, District 2 discriminated against M.M. on the basis of his disability in violation of the IHRA.

141.    As a direct and proximate result of District 2's unlawful conduct, M.M. suffered damages, including emotional distress, pain and suffering, mental anguish, inconvenience, humiliation, embarrassment, loss of educational opportunity, regression, loss of enjoyment of life, and other compensable injuries.

142.    WHEREFORE, Plaintiffs respectfully request judgment in their favor and against District 2, as follows:

    a.    Award Plaintiff such monetary damages as would fully compensate him for his injuries caused by District 2's actions;

    b.    Statutory interest;

    c.    Pre and postjudgment interest;

    d.    Costs and expenses;

    e.    Reasonable attorney fees; and

    f.    Grant any additional relief as the court deems just and proper.

**COUNT TWO: VIOLATION OF THE IHRA FOR DISCRIMINATION FOR ASSOCIATION WITH AN INDIVIDUAL WITH A DISABILITY, DISCRIMINATION BY DISTRICT 2 AGAINST METTISA AND DAN**

143.     Plaintiffs reallege and incorporate herein by reference the foregoing paragraphs of this Complaint.

144.     It is the public policy of the State of Illinois to prevent disability discrimination in elementary, secondary, and higher education.

145.     At all relevant times, Plaintiff M.M. was a qualified individual with a disability within the meaning of the IHRA, including 775 ILCS 5/1-103(I). M.M. has multiple physical and mental impairments, including Cerebral Palsy, Hydrocephalus, and a seizure disorder, that substantially limit one or more major life activities, including learning, communicating, mobility, and self-regulation.

146.     M.M. can access his education with reasonable accommodation.

147.     At all relevant times, Plaintiffs Mettisa McLeod and Dan McLeod were individuals associated with a person with a disability within the meaning of 775 ILCS 5/1-103(I)(2). They are M.M.'s parents, primary caregivers, and advocates, and District 2 knew of their association with M.M. and their role in seeking accommodations and equal access for him.

148.     District 2 is an Institution of Elementary, Secondary, or Higher Education as defined by 775 ILCS 5/5A-102(A).

149.     District 2 is a place of public accommodation as defined by 775 ILCS 5/5-101(A)(11).

150.     Plaintiff M.M. is a student as defined by 775 ILCS 5/5A-102(C).

151.     In relevant part, 775 ILCS 5/1-102(A) states it is the public policy of this state "[t]o secure for all individuals within Illinois the freedom from discrimination against any individual because of his or her…disability….and the availability of public accommodations."

21

152.    In relevant part, 775 ILCS 5/1-103(I)(2) states, "[d]iscrimination based on disability includes unlawful discrimination against an individual because of the individual's association with a person with a disability."

153.    District 2 discriminated against Mettisa McLeod and Dan McLeod because of their association with M.M., an individual with disabilities, by disregarding and minimizing their concerns regarding M.M.'s need for accommodations, failing to take their advocacy seriously, excluding or limiting their meaningful participation in decisions affecting M.M.'s access to school programs, refusing to provide timely and accurate information necessary for them to advocate on his behalf, and responding to their requests for accommodations with hostility, dismissal, or obstruction.

154.    District 2 further discriminated against Plaintiffs by treating their efforts to secure equal access for M.M. as burdensome or adversarial, rather than engaging with them in good faith as parents of a student with disabilities.

155.    At all relevant times herein, District 2 had actual knowledge of M.M.'s meaningful exclusion from school and the substantial risk of harm that this created for M.M.

156.    District 2 was deliberately indifferent to Parents' unqualified right to advocate for M.M.'s meaningful participation in its education programs.

157.    By refusing to make reasonable accommodations to its education programs to allow Parent to advocate for M.M.'s meaningful participation in education programs, District 2 discriminated against Plaintiffs on the basis of their association with an individual with a disability.

158.    As a direct and proximate result of District 2's unlawful conduct, Mettisa McLeod and Dan McLeod suffered damages, including emotional distress, pain and suffering, mental anguish, inconvenience, humiliation, embarrassment, loss of enjoyment of life, stress, and other

compensable injuries.

159.    WHEREFORE, Plaintiffs Mettisa McLeod and Dan McLeod respectfully request judgment in their favor and against District 2, as follows:

a.    Award Plaintiff such damages as would fully compensate them for their injuries caused by District 2's actions;

b.    Statutory interest;

c.    Pre and postjudgment interest;

d.    Costs and expenses;

e.    Reasonable attorney fees; and

f.    Grant any additional relief as the court deems just and proper.

## COUNT THREE: RETALIATION IN VIOLATION OF THE IHRA AGAINST ALL PLAINTIFFS

160.    Plaintiffs reallege and incorporate herein by reference all preceding paragraphs as though fully set forth herein.

161.    The Illinois Human Rights Act prohibits retaliation against any individual because he or she has opposed discrimination, requested accommodations, or participated in proceedings under the Act.

162.    At all relevant times, Plaintiff M.M. was an individual with a disability within the meaning of the IHRA, and Plaintiffs Mettisa McLeod and Dan McLeod were individuals associated with a person with a disability.

163.    Plaintiffs engaged in protected activity under the IHRA, including advocating for M.M.'s right to reasonable accommodations and equal access to educational programs, requesting independent evaluations and appropriate behavioral supports, objecting to repeated isolation, denial of supports, and inaccurate documentation, filing complaints with the Office for Civil Rights

and the Illinois State Board of Education, and filing formal charges of discrimination with the Illinois Department of Human Rights.

164. Defendant was aware of Plaintiffs' protected activity.

165. In response to Plaintiffs' protected activity, District 2 engaged in a pattern of materially adverse actions designed to deter, punish, and chill further advocacy. District 2's retaliatory conduct included, but was not limited to, issuing daily behavioral incident reports shortly after Plaintiffs filed IDHR charges, increasing M.M.'s isolation through repeated placement in the calm-down room, suspending M.M. on January 12, 2026 for conduct related to his disabilities, withholding supports necessary for M.M.'s regulation and safe participation in school, refusing accommodations such as physical therapy and other supportive services, issuing Level 4 behavior incident reports without adequate basis, and engaging in conduct intended to intimidate Plaintiffs, including focusing on Plaintiff Mettisa McLeod's professional background during communications.

166. District 2 further retaliated against Plaintiffs by dismissing their concerns, misrepresenting events, delaying or obstructing requests for information, failing to provide proper accommodations in an effort to force M.M. into another placement, and escalating disciplinary responses instead of providing reasonable accommodations and supportive interventions.

167. Defendant's actions would dissuade a reasonable parent or student from engaging in protected activity under the IHRA.

168. The temporal proximity between Plaintiffs' protected activity, including the filing of IDHR charges, and Defendant's adverse actions establishes a causal connection between the protected activity and the retaliation.

169. Defendant's conduct was intentional, willful, and/or demonstrated a reckless or

callous indifference to Plaintiffs' protected rights under the IHRA.

170.    As a direct and proximate result of Defendant's retaliatory conduct, Plaintiffs suffered damages, including loss of educational opportunity, emotional distress, humiliation, and other compensable injuries.

171.    WHEREFORE, Plaintiffs respectfully request judgment in their favor and against District 2, as follows:

   a.  Award Plaintiffs such damages as would fully compensate them for their injuries caused by District 2's actions;

   b.  Punitive damages;

   c.  Statutory interest;

   d.  Pre and postjudgment interest;

   e.  Costs and expenses;

   f.  Reasonable attorney fees; and

   g.  Grant any additional relief as the court deems just and proper.

### COUNT FOUR: VIOLATION OF SECTION 504 OF THE REHABILITATION ACT AGAINST M.M.

172.    Plaintiffs reallege and incorporate herein by reference the foregoing paragraphs of this Complaint.

173.    At all relevant times, Plaintiff M.M. was a qualified individual with a disability within the meaning of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a). M.M. has multiple physical and mental impairments, including Cerebral Palsy, Hydrocephalus, and a seizure disorder, that substantially limit one or more major life activities, including learning, communicating, mobility, self-regulation, and safe participation in school activities.

174.    M.M. was otherwise qualified to participate in and receive the benefits of District

2's educational programs, services, and activities.

175.    District 2 receives federal financial assistance and is therefore subject to the requirements of Section 504.

176.    District 2 knew of M.M.'s disabilities, knew of his need for reasonable accommodations, and knew that without appropriate supports, he would be denied equal access to educational opportunities and exposed to unnecessary harm.

177.    Plaintiffs requested reasonable accommodations and modifications necessary for M.M. to access District 2's educational programs and services safely and meaningfully. Those requested accommodations included communication supports, behavioral and sensory-regulation supports, safe access to instruction, physical supports, and other reasonable modifications tailored to M.M.'s known disabilities and needs.

178.    The accommodations requested by Plaintiffs were reasonable, necessary, and would not have imposed an undue financial or administrative burden on District 2, nor would they have fundamentally altered the nature of District 2's programs or services.

179.    Despite that knowledge, District 2 denied M.M. meaningful access to its programs and services by refusing to provide reasonable accommodations and equal educational access. District 2's discriminatory conduct included, but was not limited to, failing to provide communication and speech-related supports necessary for M.M. to access instruction, repeatedly removing M.M. from the classroom and isolating him in the calm-down room instead of providing supportive interventions, disciplining M.M. for disability-related conduct without first providing reasonable accommodations, failing to provide effective behavioral and sensory-regulation supports, and otherwise denying M.M. a meaningful opportunity to participate in classroom instruction, school activities, and the benefits of a public education on an equal basis with his peers.

26

180. District 2 acted with deliberate indifference to M.M.'s federally protected rights by knowingly failing to correct these barriers after repeated notice from Plaintiffs and by continuing practices that excluded M.M. from equal participation.

181. By refusing to make reasonable accommodations to its educational programs, services, activities, and benefits to allow M.M. to participate meaningfully, District 2 discriminated against M.M. on the basis of his disability in violation of Section 504.

182. WHEREFORE, M.M. prays as follows:

     a. Declare District 2's conduct unlawfully discriminated against M.M. and violated Section 504 of the Rehabilitation Act;

     b. Award M.M. such monetary damages as would fully compensate him for his injuries caused by District 2's actions;

     c. Award M.M. reasonable costs, expenses, attorney's fees, and prejudgment interest as permitted by 42 U.S.C. § 1988, and for all costs, expenses, fees, and pre and postjudgment interest associated with bringing this action; and

     d. For such other and further relief as the court deems just and proper.

**COUNT FIVE: VIOLATION OF THE AMERICANS WITH DISABILITIES ACT FOR DISABILITY DISCRIMINATION BY DISTRICT 2 AGAINST M.M.**

183. Plaintiffs reallege and incorporate herein by reference the foregoing paragraphs of this Complaint.

184. At all relevant times, Plaintiff M.M. was a qualified individual with a disability within the meaning of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12102 and 12131. M.M. has multiple physical and mental impairments, including Cerebral Palsy, Hydrocephalus, and a seizure disorder, that substantially limit one or more major life activities, including learning, communicating, mobility, self-regulation, and safe participation in school

activities.

185.    M.M. was otherwise qualified to participate in and receive the benefits of District 2's educational programs, services, and activities.

186.    District 2 is a public entity within the meaning of Title II of the ADA, 42 U.S.C. § 12131, and is subject to the requirements of the ADA.

187.    M.M. can access his education with reasonable accommodation.

188.    District 2 knew of M.M.'s disabilities, knew of his need for reasonable accommodations, and knew that without appropriate supports he would be denied equal access to educational opportunities and exposed to unnecessary harm.

189.    Plaintiffs requested reasonable accommodations and modifications necessary for M.M. to access District 2's educational programs and services safely and meaningfully. Those requested accommodations included communication supports, behavioral and sensory-regulation supports, safe access to instruction, physical supports, schedule and environmental adjustments, and other reasonable modifications tailored to M.M.'s known disabilities and needs.

190.    The accommodations requested by Plaintiffs were reasonable, necessary, and would not have imposed an undue financial or administrative burden on District 2, nor would they have fundamentally altered the nature of District 2's programs, services, or activities.

191.    Despite that knowledge, District 2 denied M.M. meaningful access to its programs, services, and activities by refusing to provide reasonable accommodations and equal educational access. District 2's discriminatory conduct included, but was not limited to, failing to provide communication and speech-related supports necessary for M.M. to access instruction, repeatedly removing M.M. from the classroom and isolating him in the calm-down room instead of providing supportive interventions, disciplining M.M. for disability-related conduct without first providing

reasonable accommodations, failing to provide effective behavioral and sensory-regulation supports, and otherwise denying M.M. a meaningful opportunity to participate in classroom instruction, school activities, and the benefits of public education on an equal basis with his peers.

192. At all relevant times herein, District 2 had actual knowledge of M.M.'s meaningful exclusion from school and the substantial risk of harm that this created for M.M.

193. District 2 intentionally excluded M.M. from meaningful participation in its instructional programs due to his disabilities. District 2 was deliberately indifferent to M.M.'s unqualified right to meaningful participation in its education programs.

194. By refusing to make reasonable accommodations to its educational programs, services, activities, and benefits to allow M.M. to participate meaningfully, District 2 discriminated against M.M. on the basis of his disability in violation of Title II of the Americans with Disabilities Act.

195. As a direct and proximate result of District 2's unlawful conduct, M.M. suffered damages, including loss of educational opportunity, denial of equal access to public education, inconvenience, and other compensable injuries recoverable under law.

196. WHEREFORE, Plaintiffs respectfully requests judgment in their favor and against District 2, as follows:

      a. Declaratory relief that District 2 violated Title II of the ADA;

      b. Compensatory damages recoverable under applicable law;

      c. Statutory interest;

      d. Pre and postjudgment interest;

      e. Costs and expenses;

      f. Reasonable attorney fees; and

g.    Grant any additional relief as the court deems just and proper.

## COUNT SIX: VIOLATION OF THE AMERICANS WITH DISABILITIES ACT FOR ASSOCIATION WITH AN INDIVIDUAL WITH A DISABILITY DISCRIMINATION BY DISTRICT 2 AGAINST METTISA MCLEOD AND DAN MCLEOD

197.    Plaintiffs reallege and incorporate herein by reference the foregoing paragraphs of this Complaint.

198.    At all relevant times, Plaintiff M.M. was a qualified individual with a disability within the meaning of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12102 and 12131. M.M. has multiple physical and mental impairments, including Cerebral Palsy, Hydrocephalus, and a seizure disorder, that substantially limit one or more major life activities, including learning, communicating, mobility, self-regulation, and safe participation in school activities.

199.    At all relevant times, Plaintiffs Mettisa McLeod and Dan McLeod were associated with M.M., an individual with a known disability. District 2 knew of their relationship to M.M. as his parents, caregivers, and advocates.

200.    District 2 is a public entity within the meaning of Title II of the ADA, 42 U.S.C. § 12131, and is subject to the requirements of the ADA.

201.    Pursuant to the ADA, it is discriminatory to exclude or otherwise deny accommodations or opportunities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association.

202.    M.M. can access his education with reasonable accommodations.

203.    Plaintiffs repeatedly advocated for accommodations and equal access for M.M., including requesting communication supports, behavioral supports, safe access to instruction, and other reasonable modifications necessary for M.M. to participate meaningfully in District 2's

educational programs and services.

204.    The accommodations requested by Parent on behalf of M.M. did not impose an undue financial or administrative burden or fundamentally alter the nature of District 2's programs.

205.    District 2 committed a civil rights violation, in violation of the ADA, when it did not take Parents' concerns regarding their advocacy for M.M. and the denial of his accommodations seriously due to the fact that they are associated with an individual with a disability.

206.    At all relevant times herein, District 2 had actual knowledge of M.M.'s meaningful exclusion from school and the substantial risk of harm that this created for M.M.

207.    District 2 knew that its conduct denied Plaintiffs equal treatment and interfered with their ability to advocate for M.M. because of their association with an individual with disabilities.

208.    District 2 was deliberately indifferent to Parents' unqualified right to advocate for M.M.'s meaningful participation in its education programs.

209.    By refusing to make reasonable accommodations to its education programs to allow Mettisa McLeod and Dan McLeod to advocate for M.M.'s meaningful participation in education programs, District 2 discriminated against Parents on the basis of their association with an individual with a disability.

210.    As a direct and proximate result of District 2's unlawful conduct, Plaintiffs suffered damages, including denial of equal access, inconvenience, out-of-pocket losses, and other compensable injuries recoverable under law.

211.    WHEREFORE, Plaintiffs Mettisa McLeod and Dan McLeod respectfully request judgment in their favor and against District 2, as follows:

    a.    Declaratory relief that District 2 violated Title II of the ADA;

  b.  Compensatory damages recoverable under applicable law;

  c.  Pre and postjudgment interest;

  d.  Statutory interest;

  e.  Costs and expenses;

  f.  Reasonable attorney fees; and

  g.  Grant any additional relief as the court deems just and proper.

## COUNT SEVEN: RETALIATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT AGAINST ALL PLAINTIFFS

212. Plaintiffs reallege and incorporate herein by reference all preceding paragraphs as though fully set forth herein.

213. The Americans with Disabilities Act ("ADA") prohibits retaliation against any individual who has opposed acts or practices made unlawful by the ADA, requested reasonable accommodations, or participated in any investigation, proceeding, hearing, or charge under the ADA. 42 U.S.C. § 12203.

214. District 2 is a public entity within the meaning of Title II of the ADA, 42 U.S.C. § 12131, and is subject to the requirements of the ADA.

215. At all relevant times, Plaintiff M.M. was a qualified individual with a disability within the meaning of the ADA, and Plaintiffs Mettisa McLeod and Dan McLeod were individuals associated with a person with a disability.

216. Plaintiffs engaged in protected activity under the ADA, including requesting reasonable accommodations and modifications for M.M., advocating for M.M.'s equal access to educational programs and services, objecting to discriminatory practices and the denial of accommodations, requesting records and information necessary to advocate for M.M., and filing administrative complaints and charges of discrimination.

217. Defendant was aware of Plaintiffs' protected activity.

218. In response to Plaintiffs' protected activity, District 2 subjected Plaintiffs to materially adverse actions designed to deter and punish further advocacy. District 2's retaliatory conduct included, but was not limited to, increasing disciplinary actions and behavioral incident reporting, placing M.M. in prolonged isolation through repeated use of the calm-down room, suspending M.M. for conduct related to his disabilities, withholding supports necessary for M.M.'s regulation and participation in school, denying or reducing supportive services, mischaracterizing M.M.'s conduct in official records, delaying or obstructing requests for information, failing to provide proper accommodations in an effort to force M.M. into another placement, and engaging in conduct intended to intimidate and discourage further advocacy by Plaintiffs.

219. Defendant's conduct would deter a reasonable person from engaging in protected activity under the ADA.

220. The timing and pattern of Defendant's actions demonstrate a causal connection between Plaintiffs' protected activity and the retaliatory conduct.

221. Defendant acted intentionally and with deliberate indifference to Plaintiffs' federally protected rights.

222. As a direct and proximate result of District 2's retaliation, Plaintiffs suffered damages, including educational harm, denial of equal access, inconvenience, out-of-pocket losses, and other compensable injuries recoverable under law.

223. WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against District 2, and award the following relief:

      a.      Declaratory relief that District 2 violated the ADA;

      b.      Compensatory damages recoverable under applicable law;

     c.       Pre and postjudgment interest;

     d.       Statutory interest;

     e.       Costs and expenses;

     f.       Reasonable attorney fees; and

     g.       Grant any additional relief as the court deems just and proper.

## COUNT EIGHT: INTERFERENCE, COERCION, AND INTIMIDATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT AGAINST ALL PLAINTIFFS

224.    Plaintiffs reallege and incorporate herein by reference all preceding paragraphs as though fully set forth herein.

225.    The Americans with Disabilities Act prohibits any person from coercing, intimidating, threatening, or interfering with any individual in the exercise or enjoyment of, or on account of having exercised or enjoyed, any right granted or protected by the ADA. 42 U.S.C. § 12203(b).

226.    District 2 is a public entity within the meaning of Title II of the ADA, 42 U.S.C. § 12131, and is subject to the requirements of the ADA.

227.    At all relevant times, Plaintiff M.M. was a qualified individual with a disability within the meaning of the ADA, and Plaintiffs Mettisa McLeod and Dan McLeod were individuals associated with a person with a disability who actively advocated for M.M.'s rights under the ADA.

228.    Plaintiffs exercised and attempted to exercise rights protected under the ADA, including requesting reasonable accommodations and modifications, seeking equal access to educational programs and services, objecting to discriminatory practices, requesting records and information necessary to advocate for M.M., requesting independent evaluations, and filing complaints and charges with governmental agencies, including the Office for Civil Rights, the

34

Illinois State Board of Education, and the Illinois Department of Human Rights.

229.    Defendant was aware of Plaintiffs' exercise of ADA-protected rights.

230.    Defendant engaged in conduct that constitutes coercion, intimidation, threats, and interference with Plaintiffs' exercise and enjoyment of their ADA-protected rights.

231.    District 2's unlawful conduct included, but was not limited to, pressuring Plaintiffs to verbally agree to changes in M.M.'s supports or placement without providing written documentation, refusing to meaningfully respond to records requests and withholding critical information regarding accommodations and service delivery, terminating meetings and discussions after Plaintiffs raised concerns, stating "We are done," directing Plaintiffs to "argue with the district lawyer," increasing the use of isolation and disciplinary measures against M.M. after Plaintiffs advocated for him, withholding or reducing supportive services, failing to provide proper accommodations in an effort to force M.M. into another placement, and misrepresenting incidents and M.M.'s conduct in official records.

232.    Defendant's conduct was directly connected to Plaintiffs' exercise of rights protected under the ADA and was undertaken because Plaintiffs sought to enforce those rights.

233.    Defendant's actions had the purpose and effect of discouraging Plaintiffs from continuing to advocate for M.M.'s rights and from pursuing remedies under the ADA.

234.    Defendant's conduct would deter a reasonable person from exercising or attempting to exercise rights protected by the ADA.

235.    Defendant's conduct was intentional, willful, and/or carried out with deliberate indifference to Plaintiffs' federally protected rights.

236.    As a direct and proximate result of District 2's unlawful interference, coercion, and intimidation, Plaintiffs suffered damages, including loss of educational opportunity, denial of

equal access, denial of services, inconvenience, out-of-pocket losses, and other compensable injuries recoverable under law.

237.    WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against District 2, and award the following relief:

a.    Declaratory relief that District 2 violated the ADA;

b.    Compensatory damages recoverable under applicable law;

c.    Pre and postjudgment interest;

d.    Statutory interest;

e.    Costs and expenses;

f.    Reasonable attorney fees; and

g.    Grant any additional relief as the court deems just and proper.

## COUNT NINE: VIOLATION OF THE ILLINOIS CIVIL RIGHTS REMEDIES RESTORATION ACT

238.    Plaintiffs incorporate the allegations listed above by reference.

239.    Plaintiff M.M. is an individual entitled to protection under the Restoration Act.

240.    Plaintiffs Mettisa McLeod and Dan McLeod are likewise entitled to protection under the Restoration Act because they suffered injuries resulting from Defendant's violations of federal civil rights laws through discrimination, retaliation, and interference arising from their association with M.M. and their advocacy on his behalf.

241.    At all relevant times, Defendant District 2 operated programs, services, and activities receiving federal financial assistance and functioned as a public entity subject to, among other laws, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132 *et seq.*

242.    As alleged in the preceding Counts, District 2 violated Section 504 of the

Rehabilitation Act and Title II of the Americans with Disabilities Act by discriminating against M.M. on the basis of disability, denying him reasonable accommodations, excluding him from meaningful participation in educational programs and services, retaliating against Plaintiffs for protected activity, and interfering with Plaintiffs' exercise of federally protected rights.

243. As a direct and proximate result of District 2's unlawful conduct, Plaintiffs suffered injuries and damages, including but not limited to loss of educational opportunity, denial of equal access to public education, emotional pain, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, lost wages, out-of-pocket expenses, and other monetary and nonmonetary losses recognized under 775 ILCS 60/20.

244. District 2 acted intentionally, willfully, maliciously, recklessly, and/or with deliberate indifference to Plaintiffs' protected rights, thereby entitling Plaintiffs to the full remedies available under Illinois law.

245. WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendant District 2, and award the following relief:

    a.    Declaring Defendant's actions constitute civil rights violations under 775 ILCS 60/5.

    b.    Award Plaintiffs compensatory damages for past, present, and future monetary losses and nonmonetary losses, including emotional pain, suffering, inconvenience, mental anguish, humiliation, and loss of enjoyment of life;

    c.    Award statutory damages in an amount not less than $4,000 per violation as permitted by 775 ILCS 60/20;

    d.    Award punitive damages to the extent permitted by law;

    e.    Award Plaintiffs their reasonable attorneys' fees, costs, litigation

expenses, and expert witness fees;

  f.  Award pre-judgment and post-judgment interest as allowed by law;

and

  g.  Grant any additional relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs respectfully request a trial by jury of all issues triable by a jury.

  Respectfully submitted,


  */s/ Sarah Jane Hunt*
  Sarah Jane Hunt #6316235IL
  KENNEDY HUNT, P.C.
  4500 W Pine Blvd
  St. Louis, MO 63108
  Tel: (314) 872-9041
  Fax: (314) 872-9043
  sarahjane@kennedyhuntlaw.com


## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served via the United States District Court for the Southern District of Illinois' CM/ECF electronic filing system on April 27, 2026.

  */s/ Sarah Jane Hunt*